UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TANYA Y. MCKINNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:11-cv-01462-SEB-MJD |
| MICHAEL  ASTRUE Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY**

Tanya McKinney seeks judicial review of a final decision by the Commissioner of the

Social Security Administration ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security

Act (the "Act").  *See* 42 U.S.C. §§ 416(i); 423(d); 1381a.  For the reasons detailed below, the

judgment is <u>REVERSED</u> and <u>REMANDED</u>.

**<u>Applicable Standard</u>**

To be eligible for benefits, a claimant must prove she is unable to engage in any

substantial gainful activity by reason of a medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).

To establish disability, the plaintiff is required to present medical evidence of an impairment that

results "from anatomical, physiological, or psychological abnormalities which can be shown by

medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental

impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a claimant's statement of symptoms."  20 C.F.R. §§ 416.908; 404.1508.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  20 C.F.R. §§ 404.1520 and 416.924.  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  Id.  At the first step, if the claimant is currently engaged in substantial gainful activity, then she is not disabled.  At the second step, if the claimant's impairments are not severe, then she is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and  416.924(c).  Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Administration has pre-determined are disabling.  20 C.F.R. § 404.1525.  If the claimant's impairments do not satisfy a Listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations.  20 C.F.R. §§ 404.1545 and 416.945.  At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled.  Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and her RFC, she will not be determined to be disabled if she can perform any other work in the relevant economy.  The claimant bears

2

the burden of proof at steps one through four, and at step five the burdens shifts to the Commissioner. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The task a court faces in a case such as this is not to attempt a de novo determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

Ms. McKinney applied for DIB and SSI on July 8, 2008, alleging that she was disabled since January 1, 2008. Her application was denied initially and on reconsideration. On November 16, 2010, a hearing was held before the Administrative Law Judge ("ALJ"), at which Ms. McKinney and a vocational expert testified, after which the ALJ denied the application. The Appeals Council subsequently affirmed the ALJ's denial decision, making the ALJ's opinion the final decision of the Commissioner.

At step one of the sequential evaluation process, the ALJ found that Ms. McKinney had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date. At step two, the ALJ found that Ms. McKinney suffers from the severe impairments of residuals of pituitary adenoma and conversion disorder. At step three, the ALJ found that Ms. McKinney does not have an impairment or combination of impairments that either meet or medically equal any of the conditions in the Listing of Impairments.

The ALJ found that Ms. McKinney has the RFC to perform a range of "light" work, with the following restrictions:  due to occasional headaches and mental issues, work is limited to simple, repetitive tasks requiring minimal independent judgment or analysis; work goals from day to day should be static and predictable, and she should not be required to meet unusually demanding time or production quotas.  At step four, the ALJ found that Ms. McKinney is able to perform her past relevant work as a housekeeper.  Therefore, the ALJ found that Ms. McKinney was not disabled and not entitled to benefits.

**Evidence**

**Medical Records**

On January 26, 2004, Ms. McKinney received treatment for headaches, hyperprolactinemia, and fatigue.  R. at 369.  In October 2004, she was prescribed Vicodin for her headaches.  R. at 370.  In a letter dated May 31, 2005, the registrar of Northwest High School states that Ms. McKinney took special education classes.  R. at 338.  On June 6, 2005, Ms. McKinney was evaluated by Iyas K. Sheikh Yousef, M.D.  Dr. Yousef reported that Ms. McKinney had a history of pituitary adenoma as well as problems with headaches, irregular menstrual periods, dizziness, blurred vision in the left eye, fatigue, and ringing in both ears.  R. at 341-43.

On July 1, 2005, Jerome Modlik PsyD., evaluated Ms. McKinney.  She reported that she had been involved in special education classes since the seventh grade.  She stated that her husband paid their bills because she became confused when she tried to pay them.  Dr. Modlik conducted WAIS-III testing and determined that Ms. McKinney had a verbal IQ of 66, a performance IQ of 59, and a full scale IQ of 61, which fell into the mentally retarded range of

4

functioning.  However, in his report, Dr. Modik noted that he had "the most serious doubts about these results and I suspect this WAIS-III is not valid."  R. at 350.  In support of this conclusion, Dr. Modlik cited Ms. McKinney's work history, possession of a driver's license, and independent functioning, which he opined were inconsistent with a finding that she was functioning in the mentally retarded range of intellectual ability.  *Id.*  Dr. Modik also reported that the Disability Office had not provided him with any documentation of Ms. McKinney's disabilities such as documentation of her special education services or previous reports of her intellectual functioning.  *Id.*

In March 2008, Ms. McKinney underwent an examination for a microprolactinoma (pituitary tumor).  Her endocrinologist noted that she had responded well to medication and concluded that her condition was well-controlled.  R. at 303-04.  That same month, Ms. McKinney reported to another physician that the chronic headaches she had experienced for the past ten years were becoming more frequent.  She also reported blurred vision.  R. at 304.

Two months later, in May 2008, Ms. McKinney reported that preventative medication significantly reduced her headache frequency and that she suffered from headaches approximately twice a week and they usually lasted about an hour.  She also informed the doctor at that time that corrective lenses fixed her blurred vision.  R. at 306.  That same month, Ms. McKinney reported nausea and burning stomach pain, but those symptoms improved with medication.  R. at 326, 329-30.

In August 2008, Ms. McKinney told her physician that she was experiencing knee pain, but a September 2008 MRI of her knee was normal.  R. at 321, 327.  At that time, a state agency

physician reviewed Ms. McKinney's medical record and concluded that she was able to perform a range of medium work.  R. at 311-16.

In May 2009, Ms. McKinney reported that she was suffering from abdominal pain and her physician prescribed medication.  R. at 377.  In August 2009, Ms. McKinney again told her endocrinologist that she was experiencing headaches.  At that time, the doctor noted that, despite having previously received recommendations to do so, Ms. McKinney had not sought evaluation from a specialist.  R. at 379.  In September 2009, Ms. McKinney complained of more abdominal pain.  Following an upper GI endoscopy the next month, her physician concluded that she suffered from mild systemic disease and recommended that she use Nexium.  R. at 380-81.  One month later, in October 2010, Ms. McKinney was admitted to the hospital for left-side weakness.  She remained in the hospital from October 18 to October 22, 2010.  Hospital staff noted give-away weakness, questionable effort during the evaluation, and ultimately determined that she had not suffered a stroke, instead diagnosing her with conversion disorder probably related to stress.  R. at 408, 415, 418-19.

**Claimant's Testimony**

At the time of the hearing, Ms. McKinney was 34 years old.  She testified that she lived with her two children, ages 11 and 14, and worked part time at a daycare center.  R. at 45.  Ms. McKinney asserted that she had blurry vision and black spots in her left eye and that she had problems with reading, spelling, and mathematics.  R. at 46-47, 51.  She also testified that, because of nerve damage, she had limited use of both of her hands and she would often drop things.  Ms. McKinney reported that her knees ached from arthritis.  R. at 47-48.  According to Ms. McKinney, she suffered from migraine headaches, problems with her balance, nausea,

6

vomiting, and dizziness, especially when stressed.  R. at 52.  Ms. McKinney took Amitriptyline

for her headaches, which she reported made her tired and drowsy.  She testified that she would

have to sit down when she got headaches at work or go to a dark, quiet room to rest.  Ms.

McKinney also reported that she suffered from anxiety and depression and that she had lost

weight because she had digestive problems that made it difficult for her to eat.  R. at 51.

Ms. McKinney further testified that she could stand for 15 to 20 minutes, sit for one hour,

and walk no more than a half of a block.  R. at 49.  She asserted that she could lift no more than

5 pounds with her left arm and stated that she was unable to drive at night or when it was raining

because of issues with her vision.  R. at 46.  Although Ms. McKinney was able to prepare the

family's meals, her son and daughter performed the household chores and completed the grocery

shopping.  R. at 52-53.

**Vocational Expert Testimony**

At the hearing, the ALJ asked the vocational expert ("VE") whether an individual who

was restricted to the following range of light work could perform Ms. McKinney's past work: (1)

lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently, (2)

sitting, standing, and/or walking 6 hours in an 8-hour day, (3) simple and repetitive tasks,

requiring no more than minimal independent judgment or analysis, and (4) static and predictable

work goals with no unusually demanding time or production quotas.  R. at 54-55.  The VE

responded that such an individual could perform Ms. McKinney's past work as a housekeeper,

but could not perform the job of daycare worker.  R. at 55.

When asked to assume that Ms. McKinney's testimony was credible regarding her

headaches and that she would be late to work and would have to leave work or be absent one day

a week, the VE testified that there would be no jobs she could perform.  The ALJ also asked the

VE whether there were any jobs an individual who could stand for no more than 15 minutes,

walk for no more than a half of a block, and sit for only an hour, and who had problems using

both hands, could lift nothing with her left hand, had pain in both knees, and impaired vision

which made it difficult to drive in the dark or rain, could perform.  The VE responded that there

would be no jobs such an individual could perform.

**<u>Discussion</u>**

**I.     Step Three Determination**

Ms. McKinney first argues that the ALJ erred at step three of the sequential evaluation

process by failing to assess whether her impairments meet or medically equal Listings 12.05B or

12.05C.  Listing 12.05 provides, in relevant part as follows:

> 12.05 <u>Mental Retardation</u>: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ….
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> or
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical impairment or other mental impairment imposing an additional and significant work-related limitation ….

Ms. McKinney contends that the ALJ committed reversible error by failing to address Listings 12.05B and 12.05C and ignoring the July 1, 2005 psychological evaluation performed by Dr. Modlik that proves that she met those listings. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("[A]n ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'prefunctory analysis,' may require a remand.") (citations omitted). As noted above, Dr. Modlik conducted WAIS-III testing and determined that Ms. McKinney had a verbal IQ of 66, a performance IQ of 59, and a full scale IQ of 61. Ms. McKinney contends that these scores, combined with the evidence that she attended special education classes in high school and her other physical ("residuals of pituitary adenoma") and mental ("conversion disorder") impairments recognized by the ALJ establish that she meets or medically equals Listing 12.05.

The Commissioner argues that the ALJ was not required to discuss Listing 12.05 because it requires a *valid* IQ score and the record does not contain a valid IQ score. In support of this contention, the Commissioner points to Dr. Modlik's report in which the doctor noted that he had "the most serious doubts" about the results of Ms. McKinney's IQ test and stated that he suspected that her "WAIS-III is not valid." R. at 350. This is a plausible explanation for the ALJ's failure to address Listing 12.05 that very well might be supported by substantial evidence in the record. However, the problem is that this explanation is not contained in the ALJ's opinion and is instead merely a post hoc rationalization provided by the Commissioner to supplement the ALJ's assessment of the evidence, which we do not consider. *See McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) ("[It is] improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on its decision ...."). In his opinion, the ALJ does not discuss Dr. Modlik's doubts regarding the validity of Ms. McKinney's IQ scores or

otherwise address the validity of the scores in any way.  Nor does the ALJ discuss the fact that, although Dr. Modlik noted in his report that he had "no documentation of [McKinney's] alleged special education services," (R. 350), such evidence did in fact exist in the record.  The ALJ failed to explain in what manner, if any, the evidence that Ms. McKinney had attended special education classes affected his analysis.

Instead, the ALJ notes simply that, although Ms. McKinney presented a cumulative record displaying her academic marks, "the record is absent any objective test or evidence that assesses her function or performance."  R. at 18.  It is not clear from this cursory statement whether the ALJ considered Dr. Modlik's report and, if so, whether he rejected the IQ scores provided therein as invalid.  Although the ALJ is not required to discuss every piece of evidence in the record, his failure to evaluate or even mention the IQ scores that potentially supported Ms. McKinney's claim does not convince us that he adequately considered her case.  Moreover, it appears that Dr. Modlik's doubts regarding the validity of Ms. McKinney's IQ score were based at least in part on the absence of documentation of Ms. McKinney's special education services.  Because such documentation appears to be in the record and it is the ALJ's duty to develop a full and fair record, the ALJ should assess on remand whether it is necessary for Dr. Modlik to be furnished with that documentation to determine whether it would alter his opinion.  *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) (citing *Golembiewski*, 322 F.3d at 918; *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)).  Accordingly, we remand for further analysis of the evidence at step three.

II.        **Credibility Determination**

Ms. McKinney also challenges the ALJ≠s adverse credibility determination.  Because the flaws in the ALJ≠s opinion discussed above are sufficient to necessitate remand, we need not determine whether the reasons the ALJ gave in support of his adverse credibility determination were so Apatently wrong@ so as to separately require remand.  *See Scott*, 647 F.3d at 741 (citing *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)).

III.       **Step Four Determination**

Finally, Ms. McKinney argues that substantial evidence does not support the ALJ's step four denial decision because the ALJ inaccurately assessed her RFC by failing to include any mental limitations, and thus, could not accurately determine whether her RFC would permit her to return to her previous work as a housekeeper.  The alleged error in the RFC determination is based on the same argument set forth above, to wit, that the ALJ failed to properly consider her IQ score contained in Dr. Modlik's report as well as the evidence that she had received special education services.

Because we have found for the reasons detailed above that it is unclear why the ALJ chose not to rely on that evidence and that on remand the ALJ must specifically address his reasons for discounting it in order to allow for proper review of his decision, we are unable to determine at this time whether the ALJ erred at step four by failing to incorporate any mental limitations into Ms. McKinney's RFC.  An RFC finding need only include the claimant's limitations and abilities to the extent they are supported by the record.  *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994).  Thus, if, upon review, the ALJ credits the evidence Ms.

McKinney contends supports a mental limitation, that limitation must be included in his RFC determination.  However, if, after properly explicating his reasons for doing so, he dismisses that evidence, he need include only those limitations he finds supported by the record.

**IV.     Conclusion**

For the foregoing reasons, the denial is <u>REVERSED</u> and the case is <u>REMANDED</u> to the agency for reevaluation consistent with this opinion.

IT IS SO ORDERED.

Date:     _____03/18/2013_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Patrick Harold Mulvany

patrick@mulvanylaw.com


Thomas E. Kieper

UNITED STATES ATTORNEY'S OFFICE

tom.kieper@usdoj.gov